Is 22-6039 Willis v. Johnson. Would counsel for appellant make their appearance for the record and proceed, please. Can you hear me? It looks like I was still muted. Can you hear me now, Mr. James? Thank you, Judge. I'm Gary James. I'm appearing on behalf of James Johnson for Jonathan Johnson and James Newkirk. I want to take just a few seconds of my time and acknowledge a couple things. Number one, I appreciate the court granting my emergency motion because of a health issue that actually ultimately in that week culminated to be hospitalized and I would be remiss if I don't say words about Derek Francine went above and beyond to help me through that, canceling his flight, hotel, etc. And I think in this day and age it's sometimes not acknowledged of civility among the lawyers and Mr. Francine has always been that way and I value his professionalism and his friendship. That's good. It is and all he cared about was my health and nothing else and that meant a lot to me, I promise you. I'm gonna probably spend the vast majority of my time discussing the case as it relates to Jonathan Johnson. I think the case against Mr. Newkirk, the deliberate indifference standards as it relates to qualified immunity are a little different animal. This case came about and the purpose of really wanting to discuss Johnson is I think the overlying when you look at this case is when it came up in defending this case, oh we've got a severed spinal cord, this had to be some type of excessive force used upon him, etc. And I don't believe that's what the facts are and I'm not disputing the facts found by Judge DeGiusti other than in a few areas I don't believe and this court can consider if some of the things of the facts are indifference with the record. If there are material fact disputes here don't we defer to the district courts determination that this thing needs to go to trial and you know we on the appellate side really don't have any jurisdiction at this point. Oh I agree but I think in VAT versus K-9 Deputy Sanders case that the 10th Circuit if there are facts that are in not following the the court can look at that. Well I Mr. James I respectfully I think the standard is blatantly contradicted by the record and I don't and I need you to point me to what facts you think are blatantly contradicted by the record partly because and this is a concern of mine partly because jurisdiction does turn on what set of facts we're dealing with. I mean unless you're willing to accept Judge DeGiusti's version of the facts and unless you're willing to accept Plaintiff's version of the facts we don't have jurisdiction and I did not get the sense that you were doing that and if you're not doing that we don't have jurisdiction over this case. Full stop. There are a few of the facts that I believe are indifference to Judge DeGiusti but I also think the facts of this case really twist it to the the second question of qualified immunity. Mr. Willis came to the jail after he had an altercation with Oklahoma City Police Department, was combated, was arrested. He had two instances in the jail. The one culminating with during a feeding time in a holding area that force was used and he was taken to the ground. He was shackled, both legs, handcuffs, taken to medical to get a clearance on him before he's taken upstairs and I think the shackling of him and all of those go to the point of his non-compliance. Judge DeGiusti had said that the plaintiffs or defendants had really highlighted that his non-compliance. Well, number one, that non-compliance was rectified by the shackles that multiple officers are with him in holding or in the medical evaluation going on. We have a case here where the application of force and I don't think anybody disagrees that reasonable force was prudent and necessary when dealing with a non-compliant person that might be high on some substance, but we're talking about unreasonable force, excessive force, and the amount of force that was applied here led to a severed spine and death. Why doesn't that create a question of fact that a jury might conclude that he knew he was applying deadly force and continued nonetheless? No, I would disagree that he knew he was supplying deadly force. The three-point stabilization technique is not a deadly force matter. It is a compliance technique and so while the court and we both sides have discussed whether he's a pretrial detainee, he's obviously not a per se detainee, but we're looking at it under the same standard. Let's look at the objective reasonableness of this force. He was in the jail cell. The purpose of the three-point stabilization technique, it's like a fulcrum. The right foot is put under the shoulder. It comes across the shoulder area. Your knee should be above the spine. The exhibits that we presented to it showing the picture, it our motion for summary judgment, shows that we were following the technique. Why isn't that a jury question? Whether we were following the technique? Yeah, a jury argument. I mean, isn't there evidence in the record that he was misapplying the three-point technique? No. Mr. Cornelius asked him to move, detention officer Cornelius asked him to move it from over his spine, but that was not in violation of his training. The exhibits in the record show that that was being applied correctly. Now, and why that becomes important was no one in that room. We've kind of got into this case like a res ipsa. Well, we don't know how else he severed his spinal cord. It had to come from Johnson, but there's no facts from anyone in that room that there was ever more than a millisecond or seconds of the knee over the spine. No any pain from Mr. Willis that indicates he was being injured. No any evidence of any pressure. All Mr. Picado, Mr. Cornelius, and Mr. Johnson all said there was no pressure put on the spine. Now, where I think this becomes interesting is as it relates to their own expert, Dr. Zijewski. Dr. Zijewski is very highly qualified biomechanic guy for NASA, for the Federal Department of Transportation, and what he, and his findings really buttress my argument for qualified immunity. That he says in his report that Dr., that Judge DeGiusti addressed, and it's contained in his report, that the, it's a phenomenon called creep. Creep is the pressure applied over a period of time that causes failure. He found that 230 pounds of pressure on that area of a spine could result in a severing of a spinal cord at thoracic T5 and T6. There in that report, it addresses, there is a box from Mr. Miller, a Miller study, that goes into the amount of time the pressure would have been on the spine to cause failure. We didn't put in the record, it's in the record, but could have been pointed out better. But in Dr. Zijewski's deposition, the table that he used from Miller to discuss the failure time was about 250 milliseconds. He said that the 230 pounds of pressure on that spine could have caused failure in less than two seconds. And why I think that's important is, no one has said we, the amended complaint said we hit Mr. Willis with the knee strike severing his spinal cord. There's no evidence of that from anyone. Mr. James, I'm really struggling with this case in your presentation because it appears to me you're asking us to try this case. And that's not what this is about. I mean, you we're supposed to be deciding abstract issues of law, not conflicts of facts. If they're conflicts of facts, they're construed in the light most favorable to the plaintiff. Do you accept that? Yes, sir. And I don't think I'm conflicting the facts if I am. Well, let me, there is a passage of your brief that says, quote, the court should not limit itself to considering facts only in favor of the plaintiff, nor are those the only facts that the court should consider. I don't know where, what law supports that? I mean, you cite to Tolan versus Cotton without giving a pen cite, and I've looked at Tolan versus Cotton, and I don't see anything in there that supports that statement. So what, what allows you to look to facts that support your case as opposed to the plaintiff's? No, I agree we follow the plate in the light most favorable to the plaintiff, obviously. Well, that's not the argument that you made in your brief, sir. Well, and should have been made that way, Judge. I acknowledge you're correct, obviously. Well, then let me ask, let me ask you this question. Looking at Judge DeGiusti's order, he says, quote, there's evidence suggesting Johnson's knee contacted Mr. Willis' back with force sufficient to cause the spinal injury sustained by Mr. Willis. So what do you do with that statement? I don't believe there's evidence at all before that it was caused by it. We have Dr. Bucks and Dr. Strohberg who say, well, that he has a severed spinal cord vis-a-vis. It had to come from Johnson, even though there's no facts to support that. I guess my point is the district court found that, and aren't we supposed to take the district court's interpretation of the summary judgment record for purposes of resolving this appeal? Whether you win in a trial is not really the question now. The question is, that's what the district court found. How do we avoid taking that and accepting those facts? Well, that's why I think, though, Judge, that goes to my argument on qualified immunity, is that Dr. Willis' spinal column would have come with less than 230 pounds of pressure, and this was related to and found by Judge DeGiusti for, as in the report reflects, in less than two seconds. From a standpoint of mine, all the cases the court has cited under Weigel v. Broad and McCoy v. Myers and all of those use-of-force cases, I acknowledge these are forces that went on from four to seventeen minutes. Mr. James, could you comment, before your time expires, could you comment on Mr. Newkirk and give me your best pitch on why the subjective factor for qualified immunity is not met here? Well, that's why I said I probably wouldn't spend a whole lot of time on Mr. Newkirk's argument. Because what I don't think, what the subjective is there is because, first of all, from the objective standpoint, there's no finding that he was injured. No one knew he was injured. During that brief time frame that, or say that brief over about an hour and 20 minutes when Cody Ward took over, when Mr. Newkirk comes in and starts looking at those jail logins, it shows he was setting up with his back against the wall several times there. It appears to me that Newkirk was appreciating something was going on to the point he goes to Tiffany Williamson after he's back from lunch from 1.20 p.m. to about 2.40 p.m. looking at the jail log, that's when he goes to Tiffany Williamson and says, hey, check, she's on the medical team. He is trying to appreciate those issues as they relate. See, my time is... You've got to, just please continue with your answer and I'll give you a minute now. Please go ahead. So, he goes to Tiffany Williamson. She's on the medical team and says, hey, this guy's been sleeping too long. She comes back and in her declaration that's before the address it, I got it right here, that she did not believe Mr. Willis was experiencing any serious medical conditions. It appeared Willis was laying down, appeared to be asleep. He did not appear to be struggling in any manner. Willis was lying on his side, was not agitated, did not have visible bruising, bleeding, skin discoloration, or other signs of injuries that would indicate an assault. She does go on to say, I did rely on information received from Newkirk that he observed Willis moving in the prior site checks, which is also confirmed by Cody Ward, who was out on summary judgment, that he was at least setting up it twice when they went in to put food in there with him. He had rolled over onto a thought. All right. Any further questions right now for Mr. James? All right. Thank you, Mr. James. Thank you, Judge. We'll hear from Mr. Franzen. May it please the court, my name is Derek Franzen on behalf of the Apelli family of Mitchell Everett Willis. I believe the strongest argument that I want to refute is the argument that this idea that the officers need to be told exactly what is unconstitutional. The counsel for appellant discusses Weigel and McCoy about how that doesn't provide Johnson notice that his actions are unconstitutional. When we're looking at the excessive force, you're looking at whether the officer knew and should have appreciated the risk that was there. You clearly establish is really just is the officer on notice that he could potentially cause harm to these individuals. The strongest argument here is that Johnson himself knew that placing weight on the spine, particularly the use of this maneuver, the three-point technique, was dangerous and could cause injury to an individual if he was placing his weight on his spine. We get into this back and forth about whether he's hovering over the knee, whether he's trained to hover over the knee, whether he's even trained to put the knee over the spine. There's a couple of trainees in there that specifically say you say the spine is the equator. You don't even get near the spine, yet we have Johnson saying he's putting his knee right over the spine and Cornelius is confirming that from his testimony. One of the items that Cornelius also confirms is that he's not paying attention and evaluating Johnson throughout this whole time. Same with Pichardo. Pichardo was paying attention to Mr. Willis who was on the ground. But going back to the physical evidence, we know someone severed Mitchell Willis's spine and we know Johnson knew and even said it was a bad move to perform this three-point technique. Now I think the the second thing is it doesn't have to be the court saying a three-point technique specifically is unconstitutional. It's the idea that putting your weight on the spine of an individual is dangerous. Johnson knew this. The experts in this case have said that it's dangerous. It doesn't matter whether it's one second, two minutes, five minutes. It's dangerous. How do we know though if Mr. Johnson perceives, you know, subjectively inferred that he was inflicting serious bodily injury? He admitted to the... Why wasn't this just a negligence case? Because you're looking at his knowledge about performing the excessive force and it's not negligence just to to know that you're potentially causing this harm and he missed officers. He didn't like using this maneuver because he knew it was a bad move and knew it provided risks to the spine. Second, I think more importantly, we need to look at what Willis's actions are within 13 Charlie. Willis is not combative during this time. Cornelius testifies that Willis initially had some hesitation going down to his knees but complies. He's not combative. Even Captain Green, one of the investigators of the report for the county jail, stated that Johnson's actions were excessive force and this this goes to kind of balancing the factors of what force is needed for what the officer does. Wasn't Willis on PCP and had a history of attacking guards or being non-responsive? The case law says that you can't look at prior combativeness and apply that to justifying your your current actions. By the time... Wouldn't you? If an inmate had a history of fighting guards, wouldn't you be a little more careful with him than, say, somebody else? That's not how they're trained. They're trained that if someone is still being combative, if they haven't calmed down, and that they've already been shackled, they've already been handcuffed, which Mr. Willis was, if that person is still combative, you don't unshackle them. Yes, you should be aware. You can't use excessive force though just because you're aware that you believe someone might become combative. That is not the standard that the courts have put forth. So do you agree that this could, the amount of force that can be used, might be different when you're letting a previously combative inmate loose as opposed to when you've taken one down and they've quit fighting you? I'm confused with the question. Yes, I... Let's look at, let's look at, like, Weigel, Weigel. I mean, that was a case where the excessive force came during the arrest process, right? They took him down, cuffed him, he quit fighting, and they continued to apply force. This is a case where you have someone who's been fighting, you've subdued them, but the concern is now when we let him go, he's going to, we're going to have another fight on our hands. We need to take extra caution here. I mean, isn't that, isn't that different? I believe that the, you, caution and force are two different things. Using caution to not just willy-nilly let someone loose, there's different methods that you can't stop caution, place yourself in control. There are, I believe, five or if not six officers in that cell or at the door at the time. Caution was there. The experts in this case say instead of placing them on the ground and placing your body on them and using this force, which even the defense expert Tim Tipton says is a use of force, you should place him up against the wall on his knees. That way you have control of the shackles and control of the handcuffs. And you, and you, you walk the person through the release saying, we're going to release you. If they become combative, then you use the force. He did not become combative. This, this idea that, that just because someone has had 30 minutes prior been combative, he had calmed down at that point. The video shows him walking calmly throughout the halls, following their commands all the way up the, the escalator or the elevator into 13 Charlie. He goes in there without, without issue and he has this slight hesitation about not wanting to drop down to his knees. This is a man who's 250 pounds. If, if I'm bigger than him, but if I'm handcuffed and shackled and you're asking me to go down on my knees onto cement, I'm gonna hesitate too. And that's all Willis did. And he ultimately was laid down to the ground, even though he should have just been placed up against the wall. They had control. They, they did not need to use this force. And second off, even if they needed, felt they needed to use force, there were different methods that you don't involve the spine. Johnson should never have involved the spine. Now, we're not, is it your position that this maneuver is, you know, per se excessive force? Yes, I believe the way Johnson was applying it, the way it was being trained and that's in dispute, but we're not here to discuss the differences without they were training, but putting it over the spine and him testifying that he was trained to shift his weight from his toes to his knee, which would place the weight onto the spine is per se excessive force. The spine is like he said, like one of the, uh, trainer said is the equator. You do not involve the spine. Major Heron also said you do not involve the spine. He was trained through the federal jail system. The spine in other aspects of your life, you know, not to involve the spine and, uh, high school wrestling. They, you can't do a back bow because that involves the spine and UFC. You can't punch on the spine. These are all items that are known throughout the, the, the world. And Johnson himself knew that you should not involve the spine. So, so let me just put a fine point on that. So you're saying was Johnson, Johnson was not trained, then was not trained to do a technique that involved the spine. Is that right? It's all over the place. You know, you have, you have officer Slayton who says, yes, you put, you put it over the spine and you shift your weight. You have Johnson saying you shift your weight to the knee. Then they kind of backtrack and say, well, you hover over the knee over the spine. Then you have other officers who are saying you never even hover over the spine. So, so your, so your, your point about this being per se unconstitutional or excessive is based upon your reading of what the experts say then, right? The experts and other officers, uh, major Heron officer Ruby, it's not just the experts. It is also other officers who are employed there at the facility, but Johnson himself, let me, let me cut. Go ahead. I'm sorry, finish your answer. Well, let's just say Johnson himself, even if he was trained into this way, you can be trained to do something unconstitutional that doesn't absolve me. If you already have the awareness, if you subjectively know, that's what the purpose of our constitution of these laws are. And that's what we believe and looked at that. We go, we didn't even have the officer saying he knew that his fixation was the risk. The court said that the officer should have been aware. Well, under, it's an objective standard anyway. So what he knew is irrelevant, isn't it? I don't, I don't think it's irrelevant. I think it goes, it just heightens the objective standard. Well, it's what a reasonable officer should have known. So whether he knew or didn't know, doesn't turn on what a reasonable officer should know. Does it? Yes, it does. I think because we're just using his testimony to identify what's reasonable. The reasonableness is that he knew it was the risk. A reasonable officer would know it was risk. If it's a risk of placing the spine, you do not subject the person to that risk. The subjective is harder to reach than objective. And we have the, we have the expert testimony saying it's objectively dangerous. And we have the case law saying objectively, you don't place your weight onto the back of an individual once they are subdued, once they are not, are compliant, which was. And wouldn't that case law, wouldn't that case law be sufficient, irrespective of what the officer believed? Absolutely. All right then. And, and then let me ask your briefing check question, whether we even have jurisdiction over this case. And so, and since you haven't raised that, I want to be clear. Are you, are, do you believe that we have jurisdiction over this interlocutory appeal? We do not. We cited the Sturdivant and McWilliams case that says that if, if the only argument is that you're disputing the facts, then there is no jurisdiction. Okay. And you're switching to Newkirk for a second. I didn't really see a clearly established law argument in connection with Newkirk. What's your best case for why the Newkirk's action violated clearly established law? And whether it was a constitutional violation or not now, clearly established law. Well, you, you, you, by, under even Booker and Estella V. Gamble, you can't intentionally or deny or delay access to medical care. Well, those are general, those are general deliberate indifference standards. Of course, our clearly established law predicate needs to be particularized. It has to be more than one thing. And so, what is your best case that would have put the officer on fair notice, Newkirk, that what he was doing violated the deliberate indifference standard? Well, there are cases that on paralysis, permanent handicap and considerable pain also qualifies as what is an objective need. That's the requirement of B. Roberts. And detainee's death meets the requirement without a doubt. That's Burke v. Rigolo. And subjective standard, what would have been your best case to indicate that Newkirk would have been on notice that what he was doing was against the law at the time that in, I guess it was 2017 when this happened? Well, the subjective notice he was trained that if the person is not moving, is not showing proof of life, which is signs of breathing, which even counsel for Mr. Newkirk acknowledged that he had concerns. This idea that Williamson is the individual who did not, who he went to, is on the medical team is completely inappropriate. She is just a guard on medical escort. All she's doing is escorting medical individuals. She's not further medically trained. And she's not a nurse. She's not someone who is on the medical team. She is just security that is assigned to the medical team. And so Newkirk himself knew that he had distressed breathing. And when we look at the subjective knowledge, he himself, in looking at the video, is routinely pausing at the window, kicking on the door, admits to the investigators that he did not get a response. That is in the key instances. Even identified that Willis was grunting and distressed breathing from the moment he left, was placed in there. Did Newkirk know that there'd been a use of force or force applied to Mr. Willis? Just briefly. He knew that he had had an interaction. He had no reason to believe he was injured, did he? He observed moments of distressed breathing and grunting the second the door was shut. Aren't those symptoms of PCP withdrawal? He did not state that he believed that those were signs of PCP withdrawal. Those are that they're trained that he that those are signs of distress and should be checked out. And furthermore, regardless of whether he believed his PCP, he did not notify them and get a response. If you go more than two to three times without movement, you should be getting an affirmative response. And Newkirk did not. Wasn't there some evidence that Mr. Willis had moved his arms or changed positions in the cell between the visual, the sight checks? Not from Newkirk when he spoke to the investigators. He changed his testimony throughout, but when he spoke to Newkirk, he did not have movement. So during the entire time that Newkirk observed the decedent, he did not see him move. That's that's your reading of the record. Did not see him move, had concerns about his breathing, which is one of the reasons he states that he went to Williamson is to ask, is Willis even breathing? If you think someone's moving around, you're not concerned about their breathing. He could not even determine if Willis was breathing. And when he spoke to investigators, he confirmed with them. And this is hours before he finally tells the nurse. He tells the investigators that he spoke with Williamson and another officer, neither of which could tell him that they saw Willis breathing. Okay, Mr Francine, your time is up. Mr James, I'm gonna give you 30 seconds if you have something to say. If not, we'll just conclude the proceeding. No, Judge, I read the provision that sometimes just shut your mouth. Good idea. So thank you. Well, I appreciate your infinite wisdom, and we'll we'll consider the case submitted.